UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

**In re: Derek Frost Gray**　　　　　　　　　　**Case No. 22-31731-KLP**

**Autymn Wingenbach and
Steven Wingenbach,**
　　　**Plaintiffs,**

**v.**　　　　　　　　　　　　　　　　　**Adv. Pro. No. 22-03120-KLP**

**Derek Frost Gray,**
　　　**Defendant.**

## MEMORANDUM OPINION

This matter came before the Court for trial on October 5, 2023, on the "Complaint to Determine Dischargeability of Debt" filed by Plaintiffs Autymn and Steven Wingenbach (the "Plaintiffs" or the "Wingenbachs"), and the answer thereto filed by the defendant debtor, Derek Frost Gray (the "Debtor"). The parties, through counsel, presented their evidence and argument, and at the conclusion of the trial, the Court took the matter under advisement.

### Background

In August of 2018, the Debtor formed STL Home Restoration LLC ("STL"), a Missouri limited liability company, for the purpose of conducting business as a general contractor. The Debtor has been STL's sole member and employee since its formation. On August 26, 2019, the parties executed a contract (the "Contract") in which STL would provide materials and labor for improvements at the Plaintiff's future home at 5876 Lynnview Acres, Hillsboro, Missouri, in exchange for payments totaling $87,078.73.

After expending over $80,000 in payments to STL and material suppliers, the Plaintiffs determined that STL's work on the project was deficient, requiring Plaintiffs to engage another contractor to repair and replace numerous problems caused by STL and to

1

finalize the work that STL had failed to complete. Subsequently, the Plaintiffs learned that the Debtor had misrepresented his qualifications to them, including that he held a valid contractor's license and that he was insured and competent to perform the work required by the Contract.

Seeking relief against STL and the Debtor, in accordance with the terms of the Contract, the Plaintiffs initiated an arbitration proceeding in Missouri against STL and the Debtor through the American Arbitration Association (the "Arbitration Action"). In the Arbitration Action, the Plaintiffs alleged that STL and the Debtor had breached the Contract and violated the Missouri Merchandising Practices Act, Mo. Rev. Stat.§ 407.005 – 407.2090 (the "MMPA"). On July 1, 2020, the arbitrator entered an award in favor of the Plaintiffs and against STL and the Debtor, jointly and severally, in the total amount of $92,313.00 (the "Arbitration Award").

The Wingenbachs filed a petition against STL and the Debtor in the Circuit Court of Jefferson County, Missouri (the "State Court"), to enforce the Arbitration Award. On February 28, 2021, the State Court entered a "Judgment of Default" (the "State Court Judgment"), affirming the arbitration award as a judgment in favor of the Plaintiffs and against STL and the Debtor, jointly and severally.

On June 28, 2022, the Debtor filed a voluntary petition under Chapter 13 in this Court, Case No. 22-31731-KLP. The Debtor's chapter 13 plan was confirmed on October 14, 2022. On October 24, 2022, the Plaintiffs initiated this adversary proceeding seeking to have the indebtedness represented by the State Court Judgment determined to be nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A).[1] The Debtor filed his answer on November 14, 2022, in which he sought the

---

[1] Subsequent references to § 523 are to 11 U.S.C. § 523.

dismissal of the adversary proceeding as well as a declaration that the debt owed to Plaintiffs is dischargeable.

## Factual Findings

On August 22, 2018, the Debtor filed Articles of Organization with the Missouri Secretary of State to form STL, a Missouri limited liability company, for the purpose of engaging in the business of general contracting. At all times, the Debtor was STL's sole member, manager and employee.

In 2019, the Plaintiffs were planning to build a home at 5876 Lynnview Acres, Hillsboro, Missouri (the "Project"), and had originally intended to retain a general contractor for that purpose. While standing in line at a Lowe's home improvement store in May of 2019, Plaintiff Autymn Wingenbach ("Mrs. Wingenbach") was approached by the Debtor, who stated that he was a general contractor and the owner of STL. The Debtor represented that he did construction work for Lowe's customers and had completed numerous construction projects. He showed Mrs. Wingenbach photographs of projects he claimed to have completed and indicated his desire to bid on the Project. He gave Mrs. Wingenbach his business card that indicated he was a licensed general contractor.

The Plaintiffs researched STL and the Debtor through STL's website, which represented that STL was licensed and insured and that its employees had a combined 35 years of construction experience. The Plaintiffs found no adverse information posted on Missouri's Better Business Bureau or state court case information website. They then agreed to meet with the Debtor to discuss the Project in more detail.

On May 15, 2019, Plaintiff Steven Wingenbach ("Mr. Wingenbach") met with the Debtor at 5876 Lynnview Acres so that the Debtor could inspect the worksite. During the meeting, Mr. Wingenbach expressed the importance of having licensed and insured subcontractors working on the Project, especially given that he and Mrs. Wingenbach were

3

considering acting as their own general contractor. In response, the Debtor reiterated to Mr. Wingenbach that he was properly licensed and insured as a general contractor, that he had owned his own company for years and that he had extensive experience in the construction industry. In fact, despite his insistence to the contrary, the Debtor was neither licensed nor insured at that time. Being unaware of the Debtor's misrepresentations, Mr. Wingenbach authorized the Debtor to submit a bid to be the general contractor for the Project.

On June 29, 2019, the Plaintiffs met with the Debtor at a McDonald's restaurant to review STL's bid to serve as a general contractor for the Project. The Plaintiffs had decided prior to meeting with the Debtor to act as their own general contractor. They asked the Debtor if he was interested in bidding on portions of the Project as a subcontractor, to which the Debtor agreed. Since they were acting as their own general contractor, it was particularly important to the Wingenbachs that any subcontractors they retained for the Project were properly licensed and insured.

On August 23, 2019, the Debtor sent Mrs. Wingenbach a proposed contract (the "Contract"), that included supplying labor and materials at 5876 Lynnview Acres at a cost of $87,078.73. The Contract provided that "[a]ll work [was] to be completed in a workmanlike manner according to current standard practices." The parties executed the Contract on August 23, 2019, with the Debtor signing on behalf of STL.

STL's work on the Project commenced on October 5, 2019. Almost immediately, the Plaintiffs began having concerns with STL's quality of work. They noticed obvious mistakes in STL's framing as well as indications that STL workers had been consuming alcohol on the job. Numerous other problems in the quality of workmanship became apparent as STL's work progressed, including the faulty installation of windows and insulation and improper construction of an outside deck. The Plaintiffs also noticed additional defects in the

installation of gutters, siding, the fireplace and door. When the Plaintiffs expressed their concerns to the Debtor, he assured them that he would correct any defects in workmanship. Instead, the quality of workmanship did not improve, and additional defects became apparent as the work progressed.

The Plaintiffs also observed that STL was not adhering to the agreed upon timeframe for completing its work. When confronted about these delays, the Debtor became evasive about STL's schedule for completing its obligations under the Contract. Further delays ensued and, by December 5, 2019, STL ceased working on the Project. As a result, the Plaintiffs were required to retain other contractors to complete STL's portion of the Project.

At the trial before this Court, the Plaintiffs offered the expert testimony of a general contractor, Bill Williams. Mr. Williams inspected STL's work on December 10, 2019. He testified to numerous defects in workmanship on the deck, windows, framing and siding that required extensive remediation. He described the efforts necessary to correct and replace the defective work, in addition to the costs already incurred by the Plaintiffs.

The Debtor testified that he was the only employee of STL but that he had, from time to time, hired laborers as independent contractors to assist STL, although none had substantial experience in construction. He employed some of these independent contractors to work on STL's portion of the Project. Prior to executing the Contract, the Debtor had relied on an acquaintance, James Cary, an experienced contractor, to assist with preparation of STL's bid and to help advise and guide the Debtor with STL's contractual obligations on the Project. The Debtor did not disclose his reliance on James Cary to the Plaintiffs. Moreover, before beginning work, the Debtor's relationship with Cary terminated, leaving him with no one with the necessary experience and expertise to manage STL's work.

5

The Debtor's testimony included a description of his work experience. He readily admitted that he had never served as a general contractor nor built or even framed a house, and he acknowledged that he had limited experience constructing a deck. Most of his experience had been as a handyman working on projects costing less than $10,000.00. The Debtor's testimony left no doubt that he did not have the knowledge or experience necessary to perform STL's obligations under the Contract.

The Debtor also confirmed that he has never been licensed as a general contractor and suggested, unconvincingly, that perhaps he may have confused the contractor's license with the certificate he obtained from the state of Missouri when he registered STL as a limited liability company. The Debtor further admitted that while STL had, at one time, maintained liability insurance, the policy had lapsed for nonpayment of the premium in the spring of 2019. Neither he nor STL was insured at the time they conducted business with the Plaintiffs. The Debtor's testimony confirmed that he knew his representations to the Plaintiffs that he was licensed and insured were untrue.

After STL abandoned the Project, the Plaintiffs retained the services of a local attorney, Kim Nickless, to assist them in pursuing their claim against STL and the Debtor. In accordance with the Contract, Nickless initiated the Arbitration Action. Despite being duly notified of the Arbitration Action and of all arbitration proceedings, the Debtor chose not to participate.

On June 16, 2020, the arbitrator held an evidentiary hearing via Zoom. The Plaintiffs appeared at the hearing with Nickless and presented evidence in support of their claims against the Debtor and STL. The evidence consisted of documents and the testimony of the Wingenbachs, their contractor (Williams), and other contractors who assisted with the repairs and remediation. On July 1, 2020, the arbitrator issued the Arbitration Award.

The Arbitration Award was the result of the arbitrator's "careful review" of the evidence presented at the arbitration hearing. The arbitrator found in favor of the Plaintiffs and against the Debtor and STL, jointly and severally. The award totaled $92,313.00 and was comprised of damages in the amount of $34,663.00, $5475.00 for attorney's fees, $1550.00 for arbitration fees, $625.00 as compensation for the arbitrator and, pursuant to the MMPA, $50,000.00 described as "consequential damages".

The Wingenbachs then filed a petition against STL and the Debtor in the State Court to enforce the Arbitration Award. Although they were personally served with the Petition, neither the Debtor nor STL responded or took part in the State Court proceedings . . . ." On February 28, 2021, the State Court entered the State Court Judgment, affirming the arbitration award as a judgment in favor of the Plaintiffs and against STL and the Debtor, jointly and severally.

Following entry of the State Court Judgment, the Debtor moved from Missouri to Virginia and commenced his case in this Court.

Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference entered by the U.S. District Court for the Eastern District of Virginia on August 15, 1984. This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).

*The Arbitration Award.* The doctrine of collateral estoppel is applicable in § 523 dischargeability cases. *CACI, Inc. v. Ngo (In re Ngo)*, Adv. Pro. No. 21-01011-BFK, 2021 WL 2787601, at *5 (Bankr. E.D. Va. July 2, 2021) (citing *Grogan v. Garner*, 498 U.S. 279, 284-85 (1991)). "Issue preclusion, or collateral estoppel, bars the 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment . . . .' Judicially confirmed arbitration awards also have preclusive effects in

7

bankruptcy dischargeability proceedings." *In re Ngo*, 2021 WL 2787601, at *5 (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)). The Arbitration Award in this case was affirmed by the State Court when it entered the State Court Judgment on February 28, 2021. That judgment was not appealed and has become final.

> A party seeking to apply collateral estoppel is required to establish five elements:
>
>> (1) that "the issue sought to be precluded is identical to one previously litigated" . . . ; (2) that the issue was actually determined in the prior proceeding . . . ; (3) that the issue's determination was "a critical and necessary part of the decision in the prior proceeding" . . . ; (4) that the prior judgment is final and valid . . . ; and (5) that the party against whom collateral estoppel is asserted "had a full and fair opportunity to litigate the issue in the previous forum . . . ."

*Collins v. Mill Creek Mining Co.*, 468 F.3d 213, 217 (4th Cir. 2006) (quoting *Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219, 224 (4th Cir. 1998)). The record before the Court establishes that these elements are satisfied in this case.

The Arbitration Award included findings that STL breached both the Contract and the MMPA and that both STL and the Debtor are liable for the Wingenbachs' damages. Although the arbitrator concluded that STL and the Debtor violated the MMPA, which necessarily requires the finding of the "use or employment of a deception, a fraud, a false pretense, a false promise, a misrepresentation, an unfair practice, or a concealment, suppression or omission of a material fact," Mo. Rev. Stat. § 407.020, it is unclear that a determination that the MMPA has been violated is sufficient in itself to establish through collateral estoppel that the Debtor's liability for the debt is nondischargeable pursuant to § 523(a)(2)(A). However, the amount of the indebtedness and the Debtor's liability therefor are issues that were determined by the arbitrator and are identical to issues that are presently before this Court. Determination of these issues was a critical and necessary part of the Arbitration Award. The Arbitration Award has been reduced to a valid final judgment. The Debtor was afforded the opportunity to litigate these issues in the

arbitration proceedings and in the State Court, though he consciously chose not to participate. The Arbitration Award was not simply the result of the Debtor's failure to participate but instead was based on the arbitrator's analysis of the evidence presented by the Plaintiffs. Accordingly, collateral estoppel applies to the issues of the amount of the indebtedness and the Debtor's liability therefor. The only question remaining is whether the debt is nondischargeable.

*Applicability of § 523(a)(2)(A).* Section 523(a)(2)(a) of the Bankruptcy Code excepts from discharge "any debt , , , for money, property, services . . . to the extent obtained by false pretenses, a false representation, or actual fraud . . . ." This Court recently held that a plaintiff seeking to have a debt determined to be nondischargeable pursuant to this section must prove by a preponderance of the evidence that:

> (1) the debtor made a representation; (2) the debtor knew the representation was false when he made the representation; (3) the debtor made the false representation with the intent to deceive the creditor; (4) the creditor relied on the representation; and (5) the creditor sustained the alleged loss and damages as a proximate result of the debtor making the representation.

*Espy v. Stevens (In re Stevens)*, 647 B.R. 299, 325 (Bankr. E.D. Va. 2022). The Court finds that these elements have been established by a preponderance of the evidence in this case.

The facts in *In re Stevens* are much the same as those existing here. In *Stevens*, a debtor misrepresented his status as a general contractor to induce a homeowner to hire him to convert her garage into a bedroom suite. The debtor's business card and website, in addition to his verbal representations, stated that he was "licensed and insured" and capable of performing the work when, in fact, he was neither insured nor a licensed contractor. *Id.* at 311. As in the present case, the plaintiff placed great reliance on the debtor's licensure and insurance qualifications. *Id.* at 331. After the debtor's work failed to meet applicable building code requirements, the plaintiff was required to retain a properly licensed contractor to remediate the debtor's defective work. *Id.* at 329. The court found

9

that the plaintiff established by a preponderance of the evidence that (1) the debtor made a representation that he was a licensed contractor, (2) that he knew or should have known that the representation was false when he made it, (3) that he made the representation with the intent to deceive, (4) that the plaintiff relied on the representation and (5) that the plaintiff suffered damages that were a proximate cause of the debtor's misrepresentation. Accordingly, the court determined that the plaintiff was entitled to a nondischargeable judgment against the debtor. *Id*. at 337.

The facts in *Stevens* are strikingly similar to the present case. Here, the evidence clearly establishes that the Debtor knew or should have known that he was not a licensed and insured contractor, yet he repeatedly misrepresented to the Wingenbachs that he was properly insured and held a current contractor's license. He did so to fraudulently induce the Wingenbachs to execute the Contract. The Wingenbachs relied on the Debtor's false representations and would not have executed the Contract had they known that he was not licensed and insured and that he lacked the expertise and experience to perform his contractual obligations. The Wingenbachs suffered damages, which resulted in the State Court Judgment. These facts are essentially undisputed.

The final element needed to establish that the State Court Judgment is nondischargeable is that the Debtor's misrepresentations were the proximate cause of the Wingenbachs' damages. Despite the arbitrator's implicit findings of fraud resulting from her determination that STL and the Debtor violated the MMPA, the Arbitration Award does not directly address proximate cause in the context of § 523(a)(2)(A).

In determining that the debtor's misrepresentations were the proximate cause of the plaintiff's damages, the court in *Stevens* relied upon an oft-cited opinion from the Fourth Circuit Court of Appeals, *Pleasants v. Kendrick (In re Pleasants)*, 219 F.3d 372 (4th Cir. 2000). In *Pleasants,* the court found that a debtor's false representation that he was a

trained architect was the proximate cause of a homeowner's need to hire third parties to correct and complete a home renovation project. Upholding the judgment of the district court and bankruptcy court,[2] the circuit court held that the debtor's misrepresentations "caused the [plaintiffs] no end of trouble and expense" and adopted the plaintiff's position that the debtor's "lack of architectural credentials resulted in a project plagued with structural defects and code violations . . . [and the debtor's] inability to perform the architectural work necessary to bring the project to closure caused the endless delays that resulted in still more damages." *Id.* at 375.

In addition to its reliance on *Pleasants*, the *Stevens* court engaged in an extensive review of similar precedents before concluding that the plaintiffs' damages were a proximate result of the debtor's misrepresentations. *Stevens*, 647 B.R. at 329-33. The court pointed to an earlier decision from this Court, *In re McKnew*, in which it had set forth the standard of proof required to establish that a misrepresentation is the proximate cause of a plaintiff's damages. In *McKnew,* this Court held that a determination that a claimant's damages are a proximate result of another's misrepresentation requires proof of "(1) causation in fact, 'loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss;' and (2) legal causation, 'if the loss might reasonably be expected to occur from the reliance.'" *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 622 (Bankr. E.D. Va. 2001) (quoting Restatement (Second) of Torts §§ 546, 548A).

---

[2] *Pleasants v. Kendrick (In re Pleasants)*, 219 F.3d 372 (4th Cir. 2000) was appealed to the Fourth Circuit after the U.S. District Court, in an unpublished opinion, affirmed the finding of the Bankruptcy Court for the Eastern District of Virginia that the debt at issue was nondischargeable pursuant to § 523(a)(2)(A). *See Pleasants v. Kendrick (In re Pleasants)*, 231 B.R. 893 (Bankr. E.D. Va. 1999).

As to the first element, causation in fact, when a false representation concerns an entity's professional licensure, a claimant can "establish causation in fact through evidence demonstrating that the Debtor's false statement regarding the license in fact induced [the plaintiff] to enter into the contract and that the misrepresentation was a substantial factor in influencing [the plaintiff]'s decision to hire the Debtor to perform the work." *Ravioli v. Creta (In re Creta)*, 271 B.R. 214, 219 (B.A.P. 1st Cir. 2002) (citing Restatement (Second) of Torts § 546). Here, there can be no question that the Debtor's false statement concerning his and STL's licensure and qualifications induced the Wingenbachs to execute the Contract and was the primary reason they hired the Debtor and STL.

Looking to the second element, foreseeability, "[w]here a contractor misrepresents attributes concerning the skill and competency to complete specified projects prior to being hired, 'there can be little question that defective work is foreseeable if the Debtor does not have the qualifications that would be required' of a properly trained professional." *Stevens*, 647 B.R. at 330 (quoting *In re Creta*, 271 B.R. at 220). When, as in this case, the false representation of licensure qualifications induces the creditor to contract with an individual whose defective work resulted in a loss to the creditor, "the creditor has established a prima facie case that the defects derive directly from the [debtor's] lack of professional qualifications . . . ." *In re Creta*, 271 B.R. at 220. The Wingenbachs' damages were the result of being fraudulently induced to hire STL and the Debtor, whose inadequate work was a foreseeable consequence of their lack of knowledge, training, and skill.

At trial, the Wingenbach's established a *prima facie* case, through their and their experts' testimony and exhibits, that their damages were the direct result of the Debtor's

lack of qualifications.[3] The Debtor simply did not possess the knowledge and skill needed to perform STL's obligations under the Contract. The Debtor has offered no credible evidence in rebuttal.

The Wingenbachs have proven by a preponderance of the evidence the elements necessary to establish that the Debtor's misrepresentations were the proximate cause of their damages. Having also satisfied the remaining *Stevens* elements, it follows that the Wingenbachs' claim against the Debtor is nondischargeable pursuant to § 523(a)(2)(A).

<u>Conclusion</u>

The Court finds that the Wingenbachs have shown by a preponderance of the evidence that the Debtor made representations concerning his status as a licensed contractor, that he knew or should have known that his representations were false at the time they were made, that he made the representations with the intent to deceive the Wingenbachs, that the Wingenbachs reasonably relied on the Debtor's misrepresentations, and that they suffered damages that were the proximate result of the Debtor's misrepresentations. The Wingenbachs' having satisfied the elements of § 523(a)(2)(A), the Court finds that their claim is nondischargeable.

The Wingenbachs' underlying claim was fully litigated in the State Court, resulting in the State Court Judgment. The State Court Judgment established the amount of damages to which the Wingenbachs are entitled. Pursuant to the doctrine of collateral estoppel, this Court is bound by the State Court's decision. The State Court Judgment, in its entirety, is therefore nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

---

[3] The court in *Stevens* noted that "[n]ondischargeablility cases involving contractors misrepresenting their professional license status focus largely on the damages that result from their lack of skill and qualification to perform the work for which they were hired." 647 B.R. at 330.

The Court will enter a separate order consistent with the findings and conclusions in this Memorandum Opinion.

Signed: January 12, 2024

                                                  /s/ Keith L. Phillips
                                        United States Bankruptcy Judge

Entered on Docket: January 12, 2024

Copies:

Neil E. McCullagh
Spotts Fain PC
P.O. Box 1555
Richmond, VA 23218-1555

James H. Wilson, Jr.
4860 Cox Road, Suite 200
Glen Allen, VA 23060

Derek Frost Gray
12617 Wood Sage West
Midlothian, VA 23114